*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BATES, Minors.

UNPUBLISHED
March 23, 2023

No. 361566
Grand Traverse Circuit Court
Family Division
LC No. 18-004645-NA

Before: GLEICHER, C.J., and K. F. KELLY and LETICA, JJ.

GLEICHER, C.J. (*dissenting*)

A primary goal of the Juvenile Code is to preserve and strengthen family relationships. This principle is reflected in the rules governing cases in which a parent's fundamental rights to the care and custody of her child are at stake. Even after a child has been removed due to parental neglect, reasonable efforts must be made to reunite parent and child. Because maintenance of the parent-child relationship "is an interest far more precious than any property right," we require clear and convincing evidence of present unfitness. *Santosky v Kramer*, 455 US 745, 758-759; 102 S Ct 1388; 71 L Ed 2d 599 (1982). We insist on these safeguards despite that those facing the loss of their children "have not been model parents," and have "strained" their family relationships. *Id.* at 753. Our procedures honor parents' "vital interest in preventing the irretrievable destruction of their family life." *Id.* Underlying the rules is a conviction that even parents who have been deeply neglectful and harmed their children may be able to rectify the conditions leading to state intervention, and must be given a reasonable opportunity to do so.

Parents who successfully undertake the work needed to properly care for their children are supposed to maintain their parental rights. That is why the grounds for termination of parental rights are written in the present tense. See, e.g. MCL 712A.19b(3)(c)(*i*) (emphasis added) ("The conditions that led to the adjudication continue to exist and there *is* no reasonable likelihood that the conditions will be rectified within a reasonable time."); MCL 712A.19b(3)(j) (emphasis added) ("There *is* a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent."). Our laws and the accompanying court rules compel judges to consider the present and the future as well as the past. And because the grounds for termination are written in the present tense, a parent's past misconduct, standing alone, does not authorize a court to terminate parental rights. A parent's

-1-

*present* ability to have a safe relationship with her children should, in most cases, outweigh past misdeeds.

This Court acknowledged this principle in *In re Gach*, 315 Mich App 83, 100-101; 889 NW2d 707 (2016), holding unconstitutional on due process grounds a statutory subsection of the Juvenile Code permitting the termination of parental rights based solely on the existence of a previous termination. We explained that if a separate statutory ground did not clearly and convincingly support termination, the existence of a previous termination could not suffice because "it cannot be clearly and convincingly proved that the parent had failed to remedy the earlier abuse or neglect that led to the earlier termination[.]" *Id*. at 100. The Court expounded that the provision at issue, MCL 712A.19(b)(3)(*l*), " 'disdains present realities in deference to past formalities' and simply 'forecloses the determinative issues of competence and care.' " *Id*., quoting *Stanley v Illinois*, 405 US 645, 657; 92 S Ct 1208; 31 L Ed 2d 551(1972). *Gach*'s emphasis on a parent's *current* situation and abilities confirms that "present realities" must carry far more significance than past problems.

Here, respondent-mother's past doomed her efforts to maintain her parental rights. Despite mother's success in constructively addressing her alcoholism and substance abuse, her willingness to take responsibility for injuring her child, and even though her children were safely placed with their father, the court terminated her parental rights. I respectfully dissent.

I

Respondent-mother made a series of tragic errors. She neglected to provide AAB, her then nine-year-old diabetic son, with adequate insulin. He developed diabetic ketoacidosis, a life-threatening condition. Mother then failed to timely obtain medical care for the child. When finally hospitalized, AAB remained in critical condition for more than a week, but survived. Mother pleaded guilty to third-degree child abuse. She admitted that she had injured her son. She was sentenced to five months in jail and 18 months' probation. Her conviction and jailing were the subjects of several articles in local newspapers.

Mother's failure to provide proper diabetes care for her son was not her only transgression. One year earlier, the Department of Health and Human Services (DHHS) had filed a petition seeking the removal of her two children from her care. The petition described several events arising from mother's alcoholism and her inability to properly care for her children while intoxicated. Despite the implementation of a safety plan, mother's chronic alcoholism led to additional Child Protective Services (CPS) encounters. The petition was withdrawn when the two children were placed with their father. Mother retained some parenting time, during which her substance abuse and mental health issues culminated in her failure to properly care for her diabetic son. And as the majority opinion details, after being released from jail mother relapsed, was arrested for shoplifting and for violating her probation, and was re-incarcerated for two months.

Mother's negligent care for her son, her substance abuse, and her mental health issues formed the bases for the DHHS's petition to terminate her parental rights. The DHHS proved that these problems existed before the court took jurisdiction and that mother was not a fit parent when the petition was filed. But after her second release from jail, mother actively engaged in rehabilitation efforts including in-patient substance abuse treatment. The evidence supported that

she made remarkable progress. No evidence suggested that she was unfit at the time of the termination hearing. To the contrary, the evidence proved the opposite: despite the DHHS's limited efforts at reunification, by the time of the termination hearing mother had turned her life around. Her efforts counted for naught, however, because the trial court focused almost exclusively on her past misdeeds.

The statutory framework contemplates that with the investment of "reasonable efforts," a parent who has transgressed still has a meaningful chance of redeeming her relationship with her children. Our law offers a parent that chance because of the precious and unique relationship at stake, and the life-altering consequences for both children and parents of destroying it. Here, these considerations should have led to two findings. First, the court should have found that petitioner failed to prove by clear and convincing evidence mother's present unfitness. Second, because the two children were safely and securely placed in the custody of their father and mother's visits with the children were uniformly positive, termination was inappropriate on best interest grounds.

II

The DHHS filed a termination petition after learning of AAB's near death from diabetic ketoacidosis, and amended it several times. The court terminated mother's parental rights under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable likelihood of harm if returned to parent). The petitions did not identify MCL 712A.19b(3)(c)(*i*) as a ground for termination, and the grounds for termination that were included in the petition contain different elements than this subsection. Aside from the due process problem this omission raises,[1] I disagree that clear and convincing evidence supported the termination of mother's rights under either MCL 712A.19b(3)(c)(*i*) or (j).

Although termination was the DHHS's goal from the outset of the 2019 proceedings, the DHHS had an affirmative obligation to make reasonable efforts to reunify mother with her children. "Under Michigan's Probate Code, the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). "Reasonable efforts to reunify the child and family must be made in all cases except those involving the circumstances delineated in MCL 712A.19a(2)."[2] *In re Simonetta*, 507 Mich 943, 943; 959 NW2d 170 (2021). The goal of providing a parent with reasonable efforts is reunification. *Hicks/Brown*, 500 Mich at 85-86. See MCL 712A.18f(3)(d).

It is unclear in the record whether the DHHS made any "reasonable" efforts to reunify mother and her children. Indeed, the DHHS's "efforts" are hard to discern; the record instead reflects that the DHHS aimed to punish mother for her son's diabetic crisis and her alcoholism,

---

[1] A parent in a child protective proceeding has a due-process right to notice of the nature of the proceeding and a meaningful opportunity to be heard. *In re TK*, 306 Mich App 698, 706; 859 NW2d 208 (2014).

[2] None of those statutory exceptions to the reasonable effort requirement were present here.

rather than helping her. Despite the DHHS's failure to engage in mother's rehabilitation, mother committed to sobriety and took responsibility for her previous misconduct.

When mother and the father of the children divorced in 2017, mother admitted to regularly abusing alcohol and benzodiazepines. After AAB's hospitalization, she spiraled even farther downward, resulting in a second incarceration. But after she emerged from jail the second time, mother went straight into a residential rehabilitation program which she described as "the absolute best thing that happened to me."

From that time until the time of the termination hearing, mother remained in therapy and underwent weekly preliminary breath tests (PBTs), all of which she passed. The evidence at the hearing demonstrated that she had successfully and positively addressed the conditions that led to the adjudication: her negligent care for her son, her substance abuse, and her mental health issues. Her trajectory was upward and positive.

A clinical therapist at Addiction Treatment Services testified that mother was forthcoming about her child abuse conviction and AAB's diabetic ketoacidosis and expressed "tremendous guilt" about it. Mother did not blame AAB or her ex-husband for the crisis but believed that she could have done things differently to prevent it. Mother expressed the same sentiments during her testimony. The therapist described mother's substantial growth during their visits, her new coping skills, and her engagement in support groups including Alcoholics Anonymous.

The supportive visitation specialist who supervised mother's visits with her children for the two months before the hearing explained that mother saw her children once a week and underwent PBTs before each visit. All were negative. The specialist had no concerns about mother's ability to care for either of her children, who were always happy to see her during visits. The witness also expressed no reservations regarding mother's ability to care for AAB's diabetes. She opined that it would be "detrimental" to both children if they did not see their mother and that they seemed genuinely attached to her.

The majority upholds the termination of mother's parental rights under MCL 712A.19b(3)(j), relying on the trial court's findings that mother failed to care for AAB's diabetes, failed to timely educate herself about AAB's diabetes until after she herself was diagnosed with type 1 diabetes,[3] deflected blame to others, and continued to have substance abuse and mental health issues. The trial court noted that "[g]iven Respondent Mother's continued propensity to diminish her role in [AAB]'s [diabetic ketoacidosis] and deflect blame along with her continued struggle with substance abuse throughout this case, there is clear and convincing evidence that there is a reasonable likelihood that the children will be harmed if they are returned to the home of Respondent Mother."

These findings are clearly erroneous factually and legally. Factually, *no* evidence presented at the hearing supported that mother was *presently* unfit or a danger to her children, or that she had a "continuing propensity to diminish her role" in AAB's diabetic ketoacidosis. To

---

[3] Although the trial court seemed to accept that mother was diagnosed with diabetes, the record seems to contradict this.

the contrary, the evidence overwhelmingly supported that mother had taken responsibility for her previous mistakes, blamed only herself, and had successfully engaged in treatment of her alcoholism and substance abuse. Legally, the trial court erred by exalting mother's past mistakes while ignoring her gains, presuming present unfitness despite the lack of evidence of it, and by failing to consider that the children were safely placed with their father.

III

More than a decade ago, our Supreme Court observed that "a child's placement with relatives weighs against termination," and held that the fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Placement with a relative is a critical fact, because while in a relative's care, children may be able to preserve their parent-child relationship.

The trial court considered that the children were safely placed with their father, yet found that termination of mother's rights was in their best interest. The court's decision rested on its misapprehension that mother continued to suffer from serious mental health and substance abuse problems, which the record does not support. The court found, "AMB and AAB's need for permanence, stability and finality, and the length of time both children may be required to wait for Respondent Mother to rectify her substance abuse and mental health issues weighs in favor of termination of Respondent Mother's parental rights as to AAB and AMB." The record reflects that both children expressed interest in continuing a relationship with their mother, although both had concerns about her ability to safely care for them. The trial court acknowledged that the children "enjoy spending time with their mother at visits," and that they were doing well in their father's care.

Given these undisputed facts, I am at a loss to understand why it is in the children's best interests to terminate their relationship with their mother. The facts are no different than those of routine custody matters in which one parent may not be in a present position to provide custody in his or her home. In such cases, family courts commonly rule that one parent will maintain sole or primary custody, while the other is permitted to visit under certain conditions. Such orders fulfil the goal of the Juvenile Code: they preserve family relationships. In custody cases, a parent's rehabilitation may provide a change of circumstances allowing for increased custodial rights. Similarly, a parent's decline may result in the elimination of parenting time. Unlike the termination of parental rights, which forever severs a child's relationship with a parent and the parent's family, less onerous and adversarial proceedings offer both parent and child the possibility of a positive relationship and the opportunity to repair the damage a parent has caused.

The termination of parental rights frees a child for adoption, and in that sense can bring a child permanence and stability. But the children here *have* permanence and stability with their father. There is no evidence whatsoever that the children's supervised visits with their mother harmed them; to the contrary, the evidence supports that the children enjoyed seeing and interacting with her.

Other state courts have recognized that "removing the child from the abusive parent's custody but allowing that parent restricted visitation rights can be a viable alternative to

-5-

termination of parental rights when it appears that a wayward parent cannot be rehabilitated but still shares a deep and beneficial emotional relationship with his or her children." *TDK v LAW*, 78 So 3d 1006, 1011 (Ala Civ App, 2011). "In such cases, permanently depriving children of association with a parent by terminating parental rights could do more harm than good to the children." *Id*. In *Mason*, our Supreme Court voiced the same sentiment regarding the children involved in that case, observing that they would "continue to live with their aunt and uncle—both tomorrow and indefinitely—while respondent works with the court and the DHS to establish his ability to safely parent them." *Mason*, 486 Mich at 168-169. Under the guidance of the family court, the respondent-father would "begin visiting with the children," with the aunt and uncle retaining "primary custody," potentially through a guardianship, if the court concluded that "the children should not be returned to respondent but an ongoing relationship with him—rather than termination—is in the children's best interests." *Id*.

Here, in its 42-page opinion exquisitely detailing mother's past failures and misdeeds, the trial court labored to ignore her successes and the powerful evidence of her present fitness. In my view, the termination of mother's parental rights based on her past conduct was mostly punitive rather than advancing anyone's best interests. I fear that the destruction of the children's relationship with their mother will punish them, as well. These children are not abused or neglected. They are not at risk of being abused or neglected. The permanent termination of their relationship with their mother punishes them as well as mother and conflicts with their short-term and long-term best interests. I would reverse.

/s/ Elizabeth L. Gleicher